IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Palmetto Conservation Foundation, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 8:08-2738-HMH |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| H.J. Smith, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Palmetto Conservation Foundation's ("the Foundation") second motion for partial summary judgment and H.J. Smith's ("Smith") motion to lift the preliminary injunction and motion to amend his answer to add a counterclaim alleging claims against the Foundation for wrongful attainment of a preliminary injunction and attorney's fees. For the reasons set forth below, the Foundation's motion for partial summary judgment is granted and Smith's motions to lift the injunction and add a counterclaim are denied.

## I. Factual and Procedural Background

During the Nineteenth Century and continuing through the earlier half of the Twentieth Century, the Greenville and Columbia Railroad Company and the Southern Railway Company obtained right-of-ways from landowners in South Carolina for the construction and operation of banked rail transportation corridors. In 1847, Greenville and Columbia Railroad Company acquired the right-of-way on the subject property from Adam Stoudemire ("Stoudemire"). Stoudemire granted to the Greenville and Columbia Railroad Company

> [t]he right of way of sufficient width for the track, cuts and embankments of the
> said road, as also for turn-outs, and all other extensions and enlargements, or repair

of the same from time to time, not to exceed 100 feet on each side, with the right to use the earth and stone within the said tract, for the construction, extension or repair of the same road. Provided, that we are to have the right of cultivation of our lands not required by the track and repair of the road; also the right of removing the timber.

(Compl. Ex. E (Right-of-Way).) Later, the Norfolk Southern Railway Company ("Norfolk Southern") acquired the right-of-way, and thereby became the successor-in-interest to the right-of-way.

By January 1995, segments of the Norfolk Southern rail transportation corridor were no longer in use. Rather than concede the termination of its right-of-ways, Norfolk Southern filed a notice with the United States Surface Transportation Board ("the STB") seeking an exemption from federal laws regarding abandonment of rail transportation corridors. The exemption was granted, and the rail corridors were considered not to have been abandoned.

At the same time, Norfolk Southern had entered into negotiations with various state governmental agencies regarding the conversion of its rail corridors into public trails. Through the National Trails Systems Act ("Trails Act"), 16 U.S.C. § 1247, Congress expressly authorized the preservation for future use of rail corridors that had ceased from continuous use by converting those corridors into public trails.

In particular, Norfolk Southern negotiated the transfer of an eleven-mile stretch of rail corridor in Newberry County, South Carolina. By quitclaim deed and contract of sale dated August 31, 1999, Norfolk Southern transferred its interest in the eleven-mile corridor to the Foundation for the purpose of trail use until such time as the rail corridor may be reclaimed for active transportation service. (Compl. Ex. B (Deed and Contract of Sale).) The 1999 transfer states that the Foundation received Norfolk Southern's right-of-way "[s]ubject to all restrictions,

2

conditions, easements, licenses, and reservations, whether or not of record." (Id.)  In this

manner, the right-of-ways were perpetuated, in some cases, over the objections of the burdened

landowners.

In 2003, several of those landowners, including Smith, filed a civil action to set aside the

transfer of interest from Norfolk Southern to the Foundation.[1]  The landowners alleged that

Norfolk Southern's discontinuation of rail traffic on the corridor amounted to an abandonment of

the right-of-way, and that their respective lands were no longer encumbered by the rights that

Norfolk Southern once held.

On March 29, 2004, summary judgment was granted for the Foundation.  The court held

that Norfolk Southern did not abandon its right-of-ways to the rail transportation corridor, and

that the STB had the authority to permit the conversion of the rails to trails.  In sum, the

Foundation was the valid holder of Norfolk Southern's right-of-ways in the disputed rail

corridor.

Smith is the fee simple owner of a parcel of property situated along the old Norfolk

Southern rail bank.  A portion of the eleven-mile rail corridor running through the town of Peak

is situated through Smith's property.  Norfolk Southern's right-of-way, which the Foundation

now holds, hereinafter referred to as the "subject property," runs for 100 feet on either side of the

rail bank as measured from the bank's centerline and includes a .22-acre parcel known as "the

Depot." (Compl. Ex. A (Property Description).)

The Foundation contends that Smith has engaged in site preparation on the subject

property, and that specifically, Smith has cut trees, cleared, and graded land.  In his answer,

---

[1] H.J. Smith et al. v. Palmetto Conservation Found., C.A. No. 8:03-1587-HMH (D.S.C.).

Smith admits that he has "instituted a project at or near the easement in question, which included clearing and grading land, as well as improving drainage." (Ans. ¶ 10.) Further, in his supplemental affidavit, Smith admitted that he cleared "approximately two-tenths of an acre." (Smith Suppl. Aff. ¶ 2.) The Foundation wrote to Smith on June 4, 2008, requesting that Smith cease his construction activities. (Compl. Ex. H (June 4, 2008 Letter).) Smith responded in a letter dated June 11, 2008, stating that he "will continue to use this land for my benefit until and unless the S.C. Supreme Court overrules and reverses the Court decision made in 1918." (Id. Ex. I (June 11, 2008 Letter).) Further, Smith stated that he "plann[ed] to apply for a permit to build an office building in a commercial zone within 120 feet of the abandoned railroad bed." (Id.)

In addition, Smith has threatened individuals who have come onto the subject property with prosecution. (Foundation Mem. Supp. Summ. J. 7-8 & Ex. A (Tony Taffar ("Taffar") Aff., generally).) In a November 28, 2005 letter, Smith requested that "work on this project be delayed until the question of ownership and privilidges [sic] be addressed in the court with proper jurisdiction; this being the circuit court, the appeals court, and the South Carolina Supreme Court." (Id. Ex. C (November 28, 2005 Letter).) In addition, Smith stated "[t]he laws of South Carolina state that anyone who tresspasses [sic] upon the land of another without the permission of the owner commits a misdemeanor . . . . It will be embarassing [sic] and detrimental to the land owner, the foundation and to the state of South Carolina should one of your employees or guests be involved in such a case." (Id. Ex. C (November 28, 2005 Letter).) The Foundation moved for a preliminary injunction on August 1, 2008.

At the hearing on the motion for preliminary injunction, Smith never denied the conduct or contested the entry of a preliminary injunction against him. The court entered a preliminary injunction on August 14, 2008. Palmetto Conservation filed a motion for summary judgment and a motion for sanctions on November 5, 2008. On December 18, 2008, the court denied the motions with leave to refile to allow the parties to engage in discovery.

The Foundation filed a second motion for partial summary judgment on June 8, 2009, requesting that the court declare that Smith

> has no right, as a matter of law, to claim the subject property for his own permanent use; to permanently enjoin [him] from engaging in any further cutting, clearing, grading, paving, construction, or site preparation on the subject property for permanent use; and to permanently enjoin [Smith] from interfering with the Foundation's entry onto or egress from the subject property for the purpose of developing, constructing, maintaining, and using the recreational trail or for future rail reactivation.

(Foundation Mot. Partial Summ. J. 1.) The same day, Smith filed a motion to amend and motion to lift the injunction. Smith moves to amend his answer to assert a counterclaim for wrongful pursuit of a preliminary injunction arguing that his actions in June 2008 were proper and to recover damages. (Proposed Amended Answer, generally.) Smith states he has suffered "substantial demonstrable monetary damages" from his inability to timber the subject property. (Id.) In his motion to lift the injunction, Smith alleges that the preliminary injunction prevents him "from conducting any timbering activities on the right-of-way or crossing the right-of-way for the purpose of timbering his adjacent lands." (Smith Mem. Supp. Mot. Lift Injunction 1.) The parties have filed responses to the motions and a hearing was held on July 22, 2009. Therefore, these motions are ripe for decision.

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### B. The Foundation's Motion

The Foundation moves for partial summary judgment on the following issues:

1.     Whether . . . Smith has the right to claim or make permanent use of all or part of the subject property.

6

2.      Whether Smith should be permanently enjoined from engaging in any
        further cutting, clearing, grading, paving, construction, or site preparation
        on the subject property for permanent use.

3.      Whether Smith should be permanently enjoined from interfering with the
        Foundation's entry onto or egress from the subject property for the purpose
        of developing, constructing, maintaining, and using the recreational trail or
        for future rail reactivation.

(Foundation Mem. Supp. Partial Summ. J. 3.)

Smith counters that the court's March 29, 2004 Order determined that the railroad had not

abandoned the right-of-way, but did not determine "the issue of right of use of the easement by

the adjoining landowners such as Defendant."  (Smith Mem. Opp'n Summ. J. 13.)

As the court recognized in its March 29, 2004 Order, the Foundation possesses a valid

right-of-way on the subject property.  (March 2004 Order 4-6.)  Smith contends that despite the

existence of the right-of-way, the Foundation's motion should be denied based on estoppel and

alternatively, the 1847 language of the grant of the right-of-way.  First, Smith argues that the

Foundation is estopped from seeking a permanent injunction because the Foundation

        engaged Defendant and made voluntary agreements to permit Defendant to conduct
        activities within the easement, which did not interfere with Plaintiff's activities
        along the former rail bed.  Defendant relied upon these representations, which were
        made by Plaintiff's most senior employee.  Defendant did so to his detriment.
        Based upon the acts of its agent, which were inarguably done in the course and
        scope of the agent's employment, Plaintiff is bound by his representations via the
        doctrine of estoppel.

(Smith Mem. Opp'n Summ. J. 13.)  Alternatively, Smith alleges that his use of the subject

property comports with the rights created by the original grantor in 1847, which reserves the right

to timber the land.  (Id. 14-17.)  In addition, Smith alleges that the Foundation took the right-of-

way in 1999 subject to Smith's historical use of the subject property based on waiver and implied license.  (Smith Suppl. Mem. Opp'n Summ. J. 2-3.)

The Foundation argues that Smith's estoppel argument fails because it has no authority to grant Smith the right to permanently use any portion of the right-of-way.  Smith alleges that he had an agreement with the Foundation that he could permanently use the portion of the subject property that was not located on the actual trail referred to as the "ditch to ditch" portion of the trail.  (Smith Mem. Opp'n Summ. J. 6 & Ex. A (Smith Aff. ¶ 18).)  However, the Foundation submits that the STB is the only authority that can grant Smith rights to permanently use any portion of the subject property.

The Foundation holds the subject property pursuant to an interim trail use agreement under the Trails Act.  The purpose of allowing interim trail use is to preserve the rail lines for possible future reactivation.  "The STB is the federal agency having exclusive jurisdiction over transportation by railroad."  <u>Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.</u>, 252 F.3d 246, 250 n.1 (3rd Cir. 2001); 49 U.S.C. § 10501(2).

"The Trails Act preserves the railroad's right-of-way by affording a State, municipality, or private group an opportunity (1) to negotiate with a railroad (2) to assume temporary managerial responsibility (3) to implement an interim use of the land (4) to build recreational trails."  <u>Fauvergue v. United States</u>, 86 Fed. Cl. 82, 85 (2009) (citing <u>Preseault v. I.C.C.</u>, 494 U.S. 1, 6-8 (1990)).  "If an agreement is reached, the interim trail use 'shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.'"  <u>Id.</u> (quoting 16 U.S.C. § 1247(d) (2000)).  This process is referred to as "railbanking."  <u>Id.</u>

> To avoid abandonment of the track, and take advantage of the Trails Act, a state, municipality, or private group can file a railbanking petition with the STB. If the railbanking petition is sufficient, and the railroad agrees to negotiate, the STB issues a NITU, which allows the railroad to salvage track and equipment, discontinue service, and prepare for the interim use without actually abandoning the railroad line. If subsequent negotiations between the railroad and the applicant for interim trail use are successful, the NITU extends indefinitely; <u>the STB retains jurisdiction for potential future railroad use</u>, and the reversionary interests of the surrounding landowners, which would ordinarily vest upon abandonment of the rail line by the railroad, continue to remain dormant until actual abandonment.

<u>Id.</u> (emphasis added and citation omitted). The STB preemption statute clearly provides that the STB's jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, . . . is exclusive." 49 U.S.C. § 10501(b) (emphasis added). Section 10501(b) further states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." <u>Id.</u> Allowing Smith to make permanent use of any portion of the subject property would amount to an abandonment of that portion of the right-of-way. Based on the foregoing, there is no genuine issue of material fact in dispute regarding this issue. The STB, as the federal agency with exclusive jurisdiction over abandonment of the right-of-way, is the only entity that could authorize any permanent use of the right-of-way by Smith. In other words, the Foundation could not authorize Smith to make permanent use of any part of the right-of-way over the subject property without authorization from the STB. Therefore, Smith's estoppel argument is without merit.

In addition, in a footnote in the fact section of his memorandum and at the hearing on this matter, Smith stated that a portion of the subject property had been obtained by a predecessor in title through adverse possession. Smith relies on 1918 litigation in the Court of Common Pleas

for Lexington County, South Carolina wherein the Southern Railway Company sued Smith's predecessor in interest, W.H. Suber ("Suber"), alleging that a building was wrongfully located within the right-of-way and demanding removal of the building.  Suber affirmatively pled adverse possession and the jury returned a defense verdict.  Smith asserts that this same building is still located within the right-of-way and is evidence of his right to exercise exclusive control over the portion of his property that falls within the subject property as long as it did "not interfere with the rail bed."  (Smith Mem. Opp'n Summ. J. 2.)  The 1918 litigation indicates that the building was located on the north side of the tract.  The parties agree that no building exists on the north side of the railroad tracks.

At the hearing on this matter, the Foundation and Smith agreed that the building standing today is located on the south side of the old rail line.  The 1918 complaint clearly states that the building at issue in the litigation was on the north side of the old rail line. The complaint describes the building as "a little house, apparently intended for a meat market" that was erected "on the said right-of-way, only a few feet from the railroad track and just opposite the plaintiff's passenger station in the town of Peak."  (Smith Mem. Opp'n Summ. J. Ex. E (1918 Compl ¶ X).) Smith describes the existing building as a warehouse in his affidavit.  (Id. Ex. A (Smith Aff. ¶ 9).)  Smith states in his supplemental affidavit that the building on the south side of the right-of-way and the building at issue in the 1918 litigation are the same because the area on the north side is not suitable for a building.[2]  (Smith Suppl. Aff. ¶ 9.)  The Foundation alleges that the complaint speaks for itself.  The pleadings from the 1918 litigation clearly state that the building

_____

[2] The court allowed Smith to file a supplemental affidavit.  Although Smith makes several of the same arguments that he previously raised, much of the affidavit concerns matters not relevant to this court's decision.

was located on the north side of the right-of-way.  This is the only competent evidence before this court.  Therefore, the court finds that the 1918 litigation is irrelevant to the issues here.

Smith also states that "in the 1950's, there were at least 8 buildings or other encroachments in the 200 ft corridor in the town of Peak."  (Smith Mem. Opp'n Summ. J. Ex. A (Smith Aff. ¶ 11).)  Further, Smith states that his thinning of the timber, fencing his property for a pasture, and constructing and maintaining a septic tank within the right-of-way amounts to a waiver or an implied license to timber and fence the land.  (Smith Suppl. Mem. Opp'n Summ. J. 2-3.)  Smith argues that pursuant to the language of the 1999 transfer, which provides that the Foundation received Norfolk Southern's right-of-way "[s]ubject to all restrictions, conditions, easements, licenses, and reservations, whether or not of record," the Foundation cannot contest Smith's historical use of the subject property.  (Compl. Ex. B (Deed and Contract of Sale).)  Smith argues that "[b]ecause of Norfolk Southern's waiver and/or grant of an implied license to Defendant, Plaintiff's interest in the right-of-way was subject to Defendant's historical use of the property."  (Smith Suppl. Mem. Opp'n Summ. J. 4.)  Smith is attempting to indirectly allege an adverse possession claim.  Smith submits that he is not asserting an adverse possession claim because he cannot adversely possess his own land.  (Id. 2.)  The court disagrees.

"[A] right-of-way of a railroad 'cannot be lost by prescriptive use or adverse possession unless by the erection of a permanent structure, accompanied by notice to the railroad company of an intention to claim adversely to its right." Atlanta & Charlotte Air- Line Railway Co. v. Limestone-Globe Land Co., 96 S.E. 188, 190 (S.C. 1918).  In Limestone-Globe,

> [a]fter the railroad was built the owners of the fee in the land continued to use so
> much of it as was within the right of way up to the railroad, as they had always
> done.  They cultivated some of it, cleared and brought into cultivation some of it,

> inclosed some of it by a wire fence in a pasture, and generally made such use of it as is customary in such cases. But no structure of a permanent nature was ever placed on the right of way, nor was any use made of it which was inconsistent with plaintiff's claim of easement, nor was any notice of any claim or use adverse to the easement ever given to the railroad company until the street in question was opened.

Id. The court held that the landowners had not acquired through possession and use the right-of-way based on adverse possession. Notably, in Smith v. Southern Railway - Carolina Division, 118 S.E.2d 440, 441 (S.C. 1961), the South Carolina Supreme Court held that "it has been consistently held in this State . . . that land embraced within a railroad right of way may under certain circumstances be acquired by adverse possession." The court found that "[s]ince frequently such a company has no immediate need for all of its easement, the use of a portion of a right of way by an individual which does not interfere with the use of the way for railroad purposes is presumptively permissive." Id. The court further noted that they

> have held that the use of such property by an adjacent landowner for agricultural purposes, such as grazing and cultivation, is ordinarily not inconsistent with the enjoyment of the easement and forms no basis for a claim of hostile possession. We have further held that merely enclosing a part of a right of way by a fence is not sufficient to put the company on notice of a claim of adverse possession.

Id. at 441-42 (citation omitted). Importantly, although the right-of-way in Smith was held in fee simple by the railroad, the Supreme Court noted that, like in the case at bar, "[i]n most, if not all, of the [prior case law relied upon by the court] the railroad company had a mere easement." Id. at 422.

Based on the foregoing, the railroad's historical allowance of encroachments within the right-of-way did not amount to a waiver or an implied license to permanently use the land outside the "ditch to ditch" area as it did not grant Smith the right to permanently use any portion of the

12

subject property. Waiver is the "intentional relinquishment of a known right." <u>Lawrimore v. Am. Health & Life Ins. Co.</u>, 276 S.E.2d 296, 297 (S.C. 1981). The railroad did not knowingly release its right to any portion of the right-of-way by allowing gratuitous use. Further, there is no implied license to use the subject property applicable in this case and Smith cites no authority for the proposition that implied license applies in this case. The sole authority relied upon by Smith is a criminal case wherein the South Carolina Supreme Court noted that a homeowner waives the right to use violence to eject a person from his home when the person was allowed to enter "by express or implied license or invitation." <u>State v. Bradley</u>, 120 S.E. 240, 242 (S.C. 1923).

At the hearing on this matter, Smith agreed that the railroad had the right to utilize all of the right-of-way for railroad purposes. The railroad had the right to use all 200 feet of the right-of-way irrespective of the encroachments. If the railroad needed to build a turnabout and a building or encroachment were in the way, the railroad could demand that it be removed, unless the landowner was able to successfully assert adverse possession. Smith has not asserted adverse possession and there is no evidence that any other alleged encroachments have successfully asserted adverse possession except for the 1918 litigation which concerns a building that is no longer existing within the right-of-way. The fact that the railroad may have gratuitously allowed certain uses did not permanently bind the railroad to continue those gratuitous uses. The Foundation can utilize the entire 200-foot right-of-way or it can gratuitously allow certain other temporary uses. However, the subject property is being held in trust in the federal railbanking program and the Foundation cannot diminish any portion of the right-of-way by allowing Smith a permanent use. Based on the foregoing, the court finds that the history of encroachments within the right-of-way was not a waiver or an implied license.

Further, even assuming that the Foundation and Smith could and did reach an agreement[3] allowing Smith to make permanent use of any portion of the subject property, that agreement is invalid because the Foundation, arguably as an agent for the STB, exceeded its authority.[4]  As a

---

[3] Despite Smith's statement in his supplemental affidavit that Driggers "asked [him] to sign an agreement regarding the scope and extent of the Foundation's easement," there is no dispute that the parties did not have a written agreement.  (Smith Suppl. Aff. ¶ 10.)  However, the parties dispute whether an oral agreement was reached in this case.  For the reasons stated herein, the court need not decide whether the parties reached an agreement.  The court notes that no genuine issues of material fact exist regarding whether an oral contract existed between the parties.  Generally, a contract concerning real estate must be in writing.  However, an oral contract can fall outside the Statute of Frauds in very limited circumstances. "An oral contract within the Statute of Frauds may be taken out by performance where one party does some act essential to performance of the agreement resulting in loss to himself and benefit to the other." Graham v. Prince, 358 S.E.2d 714, 717 (S.C. Ct. App. 1987).   Put another way, "[i]n order to overcome statutory requirements that an agreement be in writing, the party asserting estoppel must show that he suffered a definite, substantial, detrimental change of position in reliance on such agreement and that no remedy except enforcement of the bargain is adequate to restore his former position." Player v. Chandler, 382 S.E.2d 891, 894 (S.C. 1989).  Smith alleges that the Foundation is estopped to deny the agreement because he relied on the representations of the Foundation's agents to his detriment.  However, "[b]efore the estoppel doctrine can be invoked . . . there must be 'competent proof of the existence of the oral contract.'" Atlantic Wholesale Co. v. Solondz, 320 S.E.2d 720, 723 (S.C. Ct. App. 1984).  The required elements of a contract are an offer, acceptance, and valuable consideration.  Sauner v. Pub. Serv. Auth. of South Carolina, 581 S.E.2d 161, 166 (S.C. 2003).  "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." Roberts v. Gaskins, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997).  Valuable consideration may consist of "some right, interest, profit or benefit accruing to one party or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship, 503 S.E.2d 184, 186 (S.C. Ct. App. 1998).  "South Carolina common law requires that, in order to have a valid and enforceable contract, there must be a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement." Player, 382 S.E.2d at 893.  Smith argues that the consideration was an "end to the parties' disagreement" and Smith's assistance in obtaining the adjacent property owners' assistance.  (Smith Suppl. Mem. Opp'n Summ. J. 9-10.)  The court finds that is insufficient consideration.  Further, there is no evidence in the record that establishes that there was a meeting of the minds as to all essential and material terms.

[4] There is no evidence that Driggers is an agent authorized to bind the Foundation or the STB in a real estate transaction.  Smith alleges that Driggers' representations are binding on the Foundation based on apparent authority.  (Smith Suppl. Mem. Opp'n Summ. J. 5-6.) However, as discussed above, the Foundation did not have the authority to bind the STB.

general principal, "[b]ecause the power of governmental officials is both prescribed and limited by constitutional or statutory law, courts analyzing the sovereign immunity of the United States have held consistently that the act of an agent beyond what he is legally empowered to do is not binding upon the government." Velasco v. Government of Indonesia, 370 F.3d 392, 399 (4th Cir. 2004). Based on the STB's exclusive jurisdiction, Smith could not acquire the permanent use of any part of the subject property from the Foundation without authorization from the STB. To find to the contrary would defeat the purpose of the interim trail use agreements which is to preserve the right-of-way for possible future rail reactivation.

Alternatively, Smith alleges that the 1847 grant of the right-of-way reserved Smith's right to timber the land. Smith asserts that "the language of the [1847] reservation created a conveyance, which did not include any timber." (Smith Suppl. Mem. Opp'n Summ. J. 7.) The court agrees with Smith that South Carolina law governs the determination of what property rights were transferred to Greenville and Columbia Railroad Company by virtue of the 1847 right-of-way. The 1847 right-of-way states:

> The right-of-way of sufficient width for the track, cuts and embankments of the said road, as also for turn-outs, and all other extensions and enlargements, or repair of the same from time to time, not to exceed 100 feet on each side, with the right to use the earth and stone within the said tract, for the construction, extension or repair of the same road. Provided, that we are to have the right of cultivation of our lands not required by the track and repair of the road; also the right of removing the timber.

(Compl. Ex. E (Right-of-Way).) "Under a valid reservation or exception of timber growing on timber land conveyed, the grantor has such rights as are incidental to the ownership of timber. Therefore, he or she has the implied power to enter on the land, cut the timber, and take away the timber, and he or she may sell or devise his or her right." 54 C.J.S. Logs and Logging § 12.

However, Stoudemire's reservation of the rights to the timber on the subject property contains no prospective language. "[I]n a deed of conveyance of timber, even where a term of years is provided within which it may be removed, only the timber in existence at the date of the deed passes by the deed, unless there are prospective words indicating a contrary intention." Colleton Mercantile & Mfg. Co. v. Gruber, 7 F.2d 689, 694 (D.C.S.C. 1925).

Further, in Kelly v. Enterprise Lumber Co.,72 S.E. 957, 957 (N.C. 1911), a Supreme Court of North Carolina case cited by the United States District Court of South Carolina in Colleton Mercantile, the grantor conveyed the land in 1900 to Cape Fear Lumber Company but reserved "all the timber of every description on said lands, except as hereinbefore specified, together with the rights and privileges appertaining thereto." In 1911, the Cape Fear Lumber Company conveyed to the defendant the land in a document stating that "[t]he land upon which this said tract of timber stands belongs to Gaston Kelly, having been sold to him by the Cape Fear Lumber Co., *with the timber reserved*." Id. The court noted that "[c]ases of this nature usually arise where the owner conveys the timber, reserving the land. Here the deed of the Cape Fear Lumber Company to the plaintiff, December 2, 1900, conveyed the land, reserving the timber." Id. The court stated:

> The sole question presented on this appeal is the ruling of his honor that under the reservation in the deed above set out the grantor reserved only such trees as were large enough for timber trees on December 2, 1900. The language used is that he reserves "all the timber" of every description. There being no prospective words, this ruling was correct.

Id. at 958.

In Crawford v. Atlantic Coast Lumber Co., 60 S.E. 445, 446 (S.C. 1908), the South Carolina Supreme Court held that future timber growth was not included in the conveyance of

timber. The pertinent language of the instrument was "all of the pine trees," specifying size, etc., "now being on the various tracts of land described as follows:" (Describing same). Id. There were no additional words, qualifying these words, from which it could be inferred that future growth was intended, and the court therefore held that only the timber of the specified size at the time the deed was made between the parties was conveyed. Id.

In Wilson Lumber Co. v. Alderman & Sons Co., 61 S.E. 217, 217 (S.C. 1908), there was a fee simple warranty deed, without conditions or limitations, conveying "all the pine trees and timber suitable for milling purposes," and a right of entry for cutting and removal. The court held that the deed conveyed all trees and timber suitable for milling purposes at the date of the deed. There were no prospective words. Id. In the instant case, the reservation contains no prospective language as plainly indicated by the pertinent language in the 1847 right-of-way which provides that the grantors "are to have . . . the right of removing the timber." (Compl. Ex. E (Right-of-Way).)

The court finds that there is no genuine issue of material fact regarding the language of the 1847 right-of-way. The cases discussed above indicate that the right to remove timber on the subject property was limited to the timber that was present on the subject property when the right-of-way was granted in 1847 because of the lack of any prospective language in the 1847 grant.

Even if the 1847 right-of-way prospectively reserved Smith's right to timber the land, the Foundation is now using all of the subject property for purposes of the trail. As discussed above, Smith agrees that the railroad had the right to use any portion of the subject property for the railroad. Now, the Foundation has the right to use all of the subject property for trail purposes,

including retaining the flora and fauna in its natural state. In addressing interim trail use, the Court in Illig v. United States, 58 Fed. Cl. 619, 631 (2003), ruled on the rights of an interim trail operator as to the railbanked railway corridor, stating that:

> What was imposed on plaintiffs' land was a new easement which purported to preserve railroad use. . . . The new easement, in short, was intended to be capable of functioning at a later date as a railroad easement. . . . [T]he Trails Act imposed a new easement across plaintiffs' properties which retained essentially the same characteristics as the original easement, both in its location and exclusivity.

In Toews v. United States, 376 F.3d 1371, 1376-77 (Fed. Cir. 2004), the Federal Circuit held that an interim use agreement transferring the right-of-way for use as a recreational trail created a new right-of-way that exceeds the scope of the prior right-of-way. The plaintiffs, "fee simple [owners of] segments of an unused railroad right of way," brought suit under the Tucker Act alleging that the interim trail use amounted to a taking under the Fifth Amendment. Id. at 1372; see 28 U.S.C. § 1491(a)(1) & § 1346(a)(2). "The Tucker Act provides jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract." Preseault, 494 U.S. at 11-12. In Toews, the Federal Circuit held that although the government had the right to convert the railway easement into a recreational trail, it was a new and different easement creating different burdens on landowners not envisioned when the original easement was granted. The court stated:

> It is elementary law that if the Government uses (or authorizes the use of–a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation–the railroad cannot give what it does not have.

18

And it appears beyond cavil that use of these easements for a recreational trail–for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway–is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.

Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject. The Government does not dispute this proposition–the Government agrees that, consistent with the state's law, the landowner's grant defines the burden with which the land is burdened.

376 F.3d at 1376-77.

The court noted that the government's actions constituted a taking of private property. This is not a takings case. The Foundation has asserted its right to unfettered use of the subject property and Smith contests the Foundation's right to do so. The Foundation argues that <u>Toews</u> is instructive because in that case "[p]rior to the conversion to an interim trail, the landowners could use the right-of-way so long as they did not interfere with the railroad operation." (Foundation Mem. Supp. Summ. J. 11.)

Under the logic of <u>Toews</u>, as long as the Foundation is utilizing the subject property for purposes of the trail, the Foundation can utilize all of it for that purpose, including retaining the flora and fauna in its natural state. In addition, Smith's sole remedy for any alleged use by the Foundation outside the scope of the 1847 grant of the right-of-way is under the Tucker Act. The

court agrees that the Foundation's use of the subject property exceeds the scope of the original easement in that Stoudemire never envisioned that the right-of-way would be converted to a public trail which invited the public to traverse the subject property including adding amenities necessary for the trail such as camping sites, signage, and public facilities. This is not a takings case and the court must decide only the issues presently before it. However, an individual in this situation has rights arising under the Tucker Act to possibly assert a Fifth Amendment takings claim. See 28 U.S.C. § 1491(a)(1) & § 1346(a)(2).

Having found that no material facts remain in dispute concerning whether the Foundation is entitled to exclusive use of the subject property, the court considers whether the Foundation has met the requirements for a permanent injunction. To obtain a permanent injunction, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). "[I]nadequacy of damages and irreparability of harm are often treated interchangeably in the permanent injunction analysis." Safeway Inc. v. CESC Plaza Ltd. Partnership, 261 F. Supp. 2d 439, 469 (E.D. Va. 2003).

The Foundation has clearly met the requirements for a permanent injunction to issue. The Foundation has suffered and will continue to suffer irreparable harm if the injunction is not issued because Smith has already damaged the subject property through his cutting, clearing, and grading a portion of the subject property. In his supplemental affidavit, although denying that he did any permanent damage to the subject property, Smith admits that he cleared "approximately

two-tenths of an acre." (Smith Suppl. Aff. ¶ 2.)  In addition, he has interfered with the trail activities by threatening others.  (Foundation Mem. Supp. Summ. J. 7-8 & Ex. A (Taffar Aff., generally).)  Smith does not dispute his encounter with Taffar.  (Hearing Tr. 16.)  There is a substantial likelihood Smith's activities will continue because he believes he has the right to do so.  After receiving the Foundation's  June 4, 2008 letter insisting that he cease construction activities on the subject property, Smith responded in a letter dated June 11, 2008 that he intended to proceed with the construction of a permanent office building with related facilities, such as water and sewer utilities within the right-of-way.  (Compl. Exs. H & I (June 4, 2008 letter and June 11, 2008 letter).)  Although Smith, through his counsel, stated at the July 22, 2009 hearing that he no longer plans to construct a permanent building, Smith's previous actions and this letter indicate that absent a permanent injunction, the threat to construct a permanent building on the subject property is imminent.  (Hearing Tr. 42-43.)

Further, there is no lesser remedy adequate to compensate the Foundation as Smith has repeatedly indicated that he believes that he has the right to use all of the subject property not located in the "ditch to ditch" area of the trail and he has interfered with the Foundation's and public invitees uses of the subject property.  (Smith Mem. Opp'n Summ. J. 6 & Ex. A (Smith Aff. ¶ 18).)  Although Smith will suffer some loss based on his previous investment in construction activities and inability to timber the land within the subject property, the balance of hardships favors the Foundation because the damage to the trail from Smith's continuing activities would diminish the subject property which must be maintained for potential future use as a rail line.  In addition, Smith has an apparent right to assert a takings claim under the Tucker Act.  Further, if a permanent injunction did not issue, the public would be denied access to the

subject property. Smith's clearing and grading of a portion of the subject property has already damaged the value of the trail. Any further actions by Smith would continue to diminish the right-of-way.

For the same reasons stated above, the public interest would be disserved if the permanent injunction were not issued. Smith's actions in threatening trail users with trespass and interfering with the Foundation's use of the subject property violates the public interest in retaining rail lines for potential reactivation and, in the interim, providing a public trail for recreational use. Based on the foregoing, the court grants the Foundation's motion for partial summary judgment and finds as follows:

1. The court declares that Smith has no right to permanently use any portion of the subject property.

2. Smith is permanently enjoined from interfering with the Foundation's exclusive use of the subject property without the express consent of the Foundation.

3. Smith is permanently enjoined from interfering with the Foundation's activities on the subject property for the purpose of developing, constructing, maintaining, and using the recreational trail or for future rail reactivation.

### C. Smith's Motion to Lift Injunction and Motion to Amend

Smith "seeks an order . . . lifting or modifying the temporary injunction extant in the instant case." (Smith Mem. Supp. Mot. Lift Injunction 1.) In the alternative, Smith "seeks a separate order specifically permitting him to timber trees on the property that is the subject of the instant dispute, as well as allowing him ingress and egress to timber trees on land adjacent to the subject property." (Id.) In addition, Smith moves to amend his answer to assert a counterclaim

seeking damages due to the Foundation wrongfully seeking a preliminary injunction. (Proposed Answer, generally.) For the reasons set forth above, the motion to lift the injunction and motion to amend to assert a counterclaim are denied as moot.

Therefore, it is

**ORDERED** that the Foundation's motion for partial summary judgment, docket entry 69, is granted as set out above. It is further

**ORDERED** that Smith's motion to amend, docket number 67, and motion to lift the preliminary injunction, docket number 68, are denied as moot.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
July 29, 2009